UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TIMOTHY KUBISTA, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. No. 12-4066-KES |
| | ) | |
| v. | ) | MEMORANDUM IN SUPPORT |
| | ) | OF PLAINTIFF'S MOTION |
| | ) | FOR A TEMPORARY |
| VALUE FORWARD NETWORK, LLC, a | ) | RESTRAINING ORDER AND |
| Georgia limited liability corporation, | ) | PRELIMINARY AND |
| subsidiary of Value Forward Group, Inc.; | ) | PERMANENT INJUNCTION |
| and | ) | |
| | ) | |
| PAUL DIMODICA, | ) | |
| individually, and as owner, officer, manager | ) | |
| or member of Value Forward Network, | ) | |
| LLC, and founder and CEO of Value | ) | |
| Forward Group, Inc.; and | ) | |
| | ) | |
| RENEE DIMODICA, | ) | |
| individually, and as owner, officer, manager | ) | |
| or member of Value Forward Network, LLC | ) | |
| and as CEO, CFO and Secretary of Johnson | ) | |
| & Hunter, Inc., as CFO of Value Forward | ) | |
| Group, Inc.; and | ) | |
| | ) | |
| JOHNSON & HUNTER, INC., | ) | |
| a Georgia Corporation, one of the | ) | |
| organizers of Value Forward Network, | ) | |
| LLC; and | ) | |
| | ) | |
| VALUE FORWARD GROUP, INC., a | ) | |
| Delaware Corporation, one of the organizers | ) | |
| of and parent company of Value Forward | ) | |
| Network, LLC; | ) | |
| | ) | |
| Defendants. | ) | |

Under Federal Rule of Civil Procedure 65 and SDCL §§ 37-5B-48, 37-5B-49, 37-25A-48, 37-25A-49, Plaintiff Timothy Kubista, by and through his counsel of record, Judith K. Zeigler, seeks a temporary restraining order and preliminary and permanent injunction enjoining Defendants from proceeding with Arbitration with the American Arbitration Association as demanded in Ex. 22 (Defendants' Arbitration Demand). In support of his motion, Plaintiff respectfully submits as follows:

The Court should enjoin Defendants from proceeding with arbitration until the Court rules upon Plaintiff's Motion for Temporary Restraining Order, a Preliminary and Permanent Injunction, and a trial can be had to resolve Plaintiff's claims. Because Defendants willfully violated South Dakota Franchise and Business Opportunity laws, they engaged in fraud in offering an unregistered franchise and unregistered business opportunity to Mr. Kubista. As a result of Defendants' fraudulent offering, no contract was formed, nor was an arbitration agreement formed. Nonetheless, Defendants demanded expedited arbitration to occur in Georgia. Consequently, this relief is necessary for the following reasons:

1. This Court, not an arbitrator, should determine under South Dakota law the nonarbitral issue of whether a contract was formed, considering Defendants' violations of South Dakota's franchise and business opportunity statutes;

2. This Court, not an arbitrator, should determine under South Dakota law the nonarbitral issue of whether an arbitration agreement was formed, considering Defendants' violations of South Dakota's franchise and business opportunity statutes;

3. This Court, not an arbitrator, should determine the nonarbitral question of whether the arbitration agreement, even if validly formed despite Defendants willful securities law violations, covers the disputes in question and is legally enforceable;

4. The Arbitration Association has indicated that despite Plaintiff's objection to the American Arbitration Association's jurisdiction, the Arbitration will proceed. Ex. 24 (American Arbitration Association 4/12/12 letter) (stating that absent a court order arbitration will proceed, setting April 19, 2012, as the deadline by which the parties must select an arbitrator, and April 26, 2012, as the deadline by which the parties must pay their $500 for one-half of the first day's arbitration hearing cost).

5. To protect Plaintiff from irreparable harm in having to participate in a forced arbitration of nonarbitral claims, to which he did not consent due to the non-formation of the Value Forward Network Curriculum License Agreement and the non-formation of the arbitration agreement, resulting from the fraud in Defendants' offer and sale of an unregistered franchise or business opportunity; and

6. To protect Plaintiff from further irreparable harm in having to arbitrate nonarbitral claims in Georgia under the expedited process Defendants requested, which severely limits discovery which will prevent Plaintiff from discovering additional information to further show Defendants' pattern of fraud and deceit.

Plaintiff respectfully requests that the Court issue its Temporary Restraining Order and Preliminary and Permanent Injunction based upon Defendants' failure to

register the Value Forward Network Curriculum License Agreement (which constitutes a franchise and business opportunity in South Dakota), based upon Defendants' failure to make the statutorily required disclosures prior to making the offer, and based upon Defendants' fraud, deceit, misrepresentations, fraudulent representations and omissions which created a fraudulent foundation upon which the parties' entire relationship depends.

As demonstrated hereinafter, Plaintiff respectfully submits that he meets the *Dataphase* criteria to authorize this Court to issue a temporary restraining order and preliminary injunction:

(1)     Plaintiff has a probable success on the merits of his claims, that Defendants willfully violated the South Dakota securities laws, and due to Defendants' fraudulent offer to sell an unregistered franchise or unregistered business opportunity, failure to register their License Agreement offering with the South Dakota Division of Securities, that no contract was formed between the parties, no arbitration agreement was formed, Defendants' failure to make the statutorily requisite disclosures to Plaintiff prior to offering him the Agreement, and Defendants' fraud, deceit, misrepresentations, fraudulent representations and fraudulent omissions in the offering resulted in their unjust enrichment.

(2)     Plaintiff will suffer irreparable harm absent injunctive relief;

(3)     The balance of harms favors the Plaintiff; and

(4)     The public interest favors the issuance of injunctive relief.

*Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981).

I.     STATEMENT OF FACTS

Defendants market their "Value Forward Business Coaching License Program" on many business opportunity websites and on franchise websites.  Ex. 6-20 to Amended Compl.

Plaintiff Timothy Kubista and his wife, Carmen Kubista, had been running a

successful marketing, communications and advertising consulting business until October 2010, when due to the economy collapse, they lost a long-time significant client. Amended Compl. ¶ 28. The Kubistas were interested in focusing more on business consulting and decided that November 2010 would be an appropriate time for that change. Amended Compl. ¶ 29. On or about mid-November 2010, Mr. Kubista contacted Defendant Paul DiModica through an Internet website advertising the Value Forward Network Business Coaching License Program. Amended Compl. ¶ 31.

As a result of this contact, on or about November 11, 2010, Defendant Paul DiModica, CEO of Value Forward Group, emailed to Mr. Kubista in South Dakota, attaching a letter entitled "How to Work With CEO's and Executive Management Teams and Earn a CEO Income . . . as a Strategic Advisor," and a brochure entitled "Value Forward Business Coaching License Program." *See* Ex. 1 (VFN Thank You Letter), Ex. 2 (VF Brochure) to the Amended Compl; *see also* Amended Compl. ¶¶ 32, 36.

The Value Forward Thank You letter offered its potential licensees, among other things, "several profit centers," made various claims of fee-generation, attempted to differentiate itself from a franchise, and indicated that its Business Coaching License Program was based on "proven methodology." *See* Ex. 1 to Amended Complaint (VFN Thank You Letter); Ex. 2 to Amended Complaint (VF Brochure); *see also* Amended Compl. ¶¶ 33-38. The Value Forward Brochure indicated that "[t]he business coaching industry is a growth market that is recession proof," that the "Value Forward License Program offers a broad range of business profit center opportunities" and "offers you an unlimited opportunity to earn an executive income." *See* Ex. 2 to the Amended Complaint (VF Brochure); Amended Compl. ¶¶ 36-38.

Between November 11, 2010, and November 14, 2010, Mr. Kubista and

Defendant Paul DiModica had many conversations, both telephonically and by electronic mail, during which Defendant Paul DiModica provided additional information and made numerous representations, including that his licensees were charging $10,000 per day. Amended Compl. ¶¶ 39, 49.  Not once did Defendant Paul DiModica mention that a significant number of his licensees fail, that he had several prior legal disputes with licensees, and that he had not registered this offering under either SDCL Chapter 37-5B or 37-25A as statutorily required prior to making an offer of this nature in South Dakota. Amended Compl. ¶¶ 50.

On November 17, 2010, Defendant Paul DiModica emailed Mr. Kubista the names of two references and a "generic" licensing agreement form. *See* Ex. 3 to the Amended Compl. (Generic Licensing Agreement); Amended Compl. ¶ 40.  Unbeknown to Mr. Kubista, the defendants failed to register their "licensing agreement" offer as South Dakota franchise and business opportunity statutes require.  Amended Compl. ¶ 41.  Consequently, Defendants had no legal authority to offer this Value Forward Business Coaching License Program in South Dakota.

Defendant Paul DiModica would not send Mr. Kubista the actual agreement offered, albeit unlawfully, until Mr. Kubista was ready to sign, telling him that this is a "blank generic copy – once you are ready to execute we will overnight a specific copy which [sic] with your detail." *See* Amended Compl. Ex. 4  (P. DiModica email). Defendant Paul DiModica further told Mr. Kubista that paragraph "3F - is not included in our current agreements – at one time we were looking to go into Business Brokerage/ M&A and some states require you to have a license." *See* Amended Compl. Ex. 4 (P. DiModica email).  Notably, paragraph 3(f) of the "generic" agreement (which Defendants removed from the agreement sent to Mr. Kubista) mentions adherence to all

local and federal licensing requirements "including but not limited to . . . securities[.]" *See* Amended Compl. Ex. 3 (Generic Licensing Agreement).

On or about December 7, 2010, Mr. Kubista received at his Sioux Falls' address by overnight mail from Defendant Paul DiModica a licensing agreement specific to Mr. Kubista, indicating that Mr. Kubista would be Licensee 1 of 1 in South Dakota and Licensee 1 of 2 in Minnesota and indicating that the term was three years instead of the one year as indicated in the Value Forward Brochure, which "may be earlier terminated or renewed." *See* Ex. 5 Amended Compl. (Executed Licensing Agreement); Amended Compl. ¶ 45. Said licensing agreement was not accompanied by a copy of Defendants' current disclosure documents as required under South Dakota law. Amended Compl. ¶ 46. Although Mr. Kubista asked Defendant Paul DiModica to make numerous changes in the Licensing Agreement, all were refused; it was a take-it-or-leave-it adhesion contract. Amended Compl. ¶ 47. Defendant Paul DiModica told Mr. Kubista "we have everything you need to be successful[1]. We will send you 80 pounds of material," implying that there is value in quantity rather than substance. Amended Compl. ¶ 48.

Mr. Kubista executed the contract at his home at 909 West Whispering Circle, Sioux Falls, South Dakota, and mailed it from Sioux Falls, South Dakota, to Defendant Paul DiModica on December 15, 2010. Amended Compl. ¶ 48. Once the agreement was executed, for the Kubistas to get their business up and running, they needed a

---

[1] Prior to Mr. Kubista's signing of the Agreement, Defendant Paul DiModica told Mr. Kubista that he had sold somewhere between 21-25 licenses. Amended Compl. ¶ 96. Defendant Paul DiModica failed to disclose what Mr. Kubista later discovered, that at least eleven (11) of the Value Forward licensees have either been unable to pay, unwilling to pay, or generally unsatisfied with the program. Amended Compl. ¶ 96. Upon further investigation, it appears the number of licensees who were not successful and suffered the same financial devastation, verbal abuse and threats from Defendants is even higher. Amended Compl. ¶ 97. The common contentions among former Value Forward licensees appear to be that they feel defrauded, bullied and harassed by Defendant Paul DiModica, had or have no money left to pursue a remedy and state that Defendant Paul DiModica "must be stopped." Amended Compl. ¶ 98.

website, and Mr. Kubista was required to be trained and "certified" by Defendant Paul DiModica. Amended Compl. ¶¶ 52, 69. The duration, detail and depth of training and certification were not as promised and were virtually nonexistent. Amended Compl. ¶¶ 70-83.

Prior to Mr. Kubista signing the agreement, Defendant Paul DiModica said that Value Forward Network would build a website for the Kubistas. Amended Compl. ¶¶ 53. Defendants provided all of the copy for the Kubistas' website, but the Kubistas eventually rewrote it for their website and paid to have it programed professionally because of the gross inadequacy of what Defendants provided. Amended Compl. ¶¶ 54-58, 66. Nonetheless, every change and every detail to be displayed on the Kubistas' website had to be authorized by Defendant Paul DiModica. Amended Compl. ¶¶ 54-58, 66.

Throughout 2011, Defendant Paul DiModica urged Mr. Kubista to be less than honest in his business dealings, including but not limited to the following:

A. List other Value Forward licensees in the management section of Kubistas' website to make the company seem larger than it is with a deeper management team;

B. Include in Mr. Kubista's biography on the website that he "is a staff writer for the largest marketing and sales newsletter in the world, High Tech Success (newsletter published by Defendants) to give the Kubistas more credibility[2] and to allow Mr. Kubista to get into trade shows for free;

C. Recommended that even if Mr. Kubista completed recommendations expediently, he should wait at least ten days to deliver them to give the client the impression that significant effort went into the recommendations, and that they were specifically developed for that client.

---

[2]Notably, Defendant Paul DiModica refused to allow the Kubistas something which would give the Kubistas more credibility honestly, including Mrs. Kubista's biography on their website reflecting her significant business experience, unless they paid the Defendants an additional $3,000 fee. Amended Compl ¶68. Defendant insisted that Mrs. Kubista's biography read as if she were only an administrative assistant and stay-at-home mom, rather than communicate her significant business experience.

D.  Recommend that licensees use a three-inch binder full of paper and to "mark up all the pages with a red pen and use post-it notes to flag the pages" for "show," because it makes clients think their coach has been working really hard.

Amended Compl. ¶¶ 59-61, 84-87. The Kubistas did not do this, as they thought it would be dishonest and deceptive. Amended Compl. ¶¶ 62, 65, 87.

On December 2, 2011, Mr. Kubista called Defendant Paul DiModica to get some advice because the Licensing Program was not working as promised. Amended Compl. ¶ 89. Because he thought it was the honorable thing to do, Mr. Kubista candidly told Defendant Paul DiModica that he would not be able to pay the second year fee on December 15, 2011, because there had been no business success, and all assets had been liquidated to support the business and his family. Amended Compl. ¶¶ 90-91.

Rather than encouraging and offering to help Mr. Kubista, Defendant Paul DiModica became hostile, repeatedly threatened to sue, attempted to intimidate and viciously berated Mr. Kubista. Amended Compl. ¶ 92. Mr. Kubista was devastated and dejected. Defendant Paul DiModica repeatedly threatened Mr. Kubista that if he did not pay, he would sue Mr. Kubista, and the Kubistas would have to take down their website. Amended Compl. ¶ 93. Defendant Paul DiModica said "we will sue you. We have a process for this," implying that other licensees have not been able to pay. Amended Compl. ¶ 94.

Defendant Paul DiModica later, just before Christmas, left Mr. Kubista a voicemail and again threatened to sue him. Amended Compl. ¶ 99. Shortly thereafter, Defendant Paul DiModica called the Kubistas' business line, and Mrs. Kubista answered. Even after Mrs. Kubista repeatedly told him, at least five times, that she could not talk to him, that she was alone with her two small crying children, and that he had to talk to her

husband who was not home, Defendant Paul DiModica repeatedly threatened, harassed and attempted to intimidate Mrs. Kubista.  When Mrs. Kubista told him that if he was going to continue to harass and threaten her, she was going to hang up, Defendant Paul DiModica finally hung up.  Amended Compl.  ¶ 100.

Mr. Kubista then received a formal written termination from Value Forward on January 9, 2012.  Amended Compl.  ¶ 17.  As requested, Mr. Kubista returned the Value Forward information to Defendant Paul DiModica.  Amended Compl.  ¶ 17.  On February 14, 2012, Mr. Kubista, through counsel, requested the return of his initial $15,000 fee paid to Value Forward Network.  Amended Compl.  ¶ 18.  In response, Defendant Value Forward Network, LLC, unilaterally demanded expedited arbitration in Georgia, to obtain $30,000 in additional license fees for the remaining two years of the illegal agreement.  Amended Compl. ¶ 20.  Under the American Arbitration Association's procedures for expedited arbitration, discovery is curtailed, it is "assumed that the case will be heard upon document submission," and an arbitration hearing will be set to occur within 30 days of the appointment of the Arbitrator.  Ex. 23 (American Arbitration Association 3/8/12 letter) p 7-9.

Mr. Kubista filed his Summons and Complaint in state court on March 30, 2012, and forwarded them to the Arbitration Association, objecting to the Arbitration Association's jurisdiction.  Amended Compl.  ¶ 21.  Mr. Kubista filed his Motion for a Temporary Restraining Order in state court on April 10, 2012.  Doc. # 1 Ex. A (State Court File).  On April 11, 2012, Defendants removed this case to federal court. Amended Compl.  ¶ 25.  On April 12, 2012, the American Arbitration Association informed the parties that the arbitration will proceed, setting a deadline of April 19, 2012, for the parties to notify the Association of their choice of arbitrator, establishing the first

day hearing rate at $1,000, transmitting an invoice for $500 to each party and requiring payment by April 26, 2012.

## II.    AUTHORITY AND ARGUMENT

### A.    *Contract Formation is Determined by the Court not Arbitrator*

It is well-settled that the Court, not an arbitrator, has the authority to determine if a contract containing an arbitration provision was formed. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2855-2856 (2010). In making its determination, the Court should apply ordinary principles which govern the formation of contracts. *First Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 945, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995); *see also Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 701 (8th Cir. 2008).

In South Dakota a contract is formed only when there is an offer by one person, acceptance by another and consideration. *See Advanced Recycling Sys., LLC v. Southeast Props, L.P.*, 2010 SD 70, P16 (citing *Standard Cas. Co. v. Boyd*, 75 SD 617, 622, 17 N.W.2d 450, 453 (1955)). The Court should not only apply South Dakota contract law, but also the South Dakota Business Opportunity Act (SDCL Chapter 37-25A) and the South Dakota Franchise Act (SDCL 37-5B) to determine whether a contract was formed. As explained in more detail below, Plaintiff submits that Defendants' failure to register their business opportunity and franchise offering with the South Dakota Division of Securities, and their failure to make the requisite disclosures[3] to Mr. Kubista prior to extending the offer, resulted in there being no valid offer for Mr. Kubista to accept.

To lawfully offer to sell a business opportunity or franchise in South Dakota,

---

[3]The list of statutorily required disclosures is lengthy and are set forth in 16 CFR 436. Plaintiff incorporates the same by reference herein.

Defendants first had to obtain the authority from the South Dakota Division of Securities. Because they failed to do that, Plaintiff respectfully submits that after consideration of the applicable law, the Court should conclude that Defendants engaged in fraud in the offer and sale of an unregistered business opportunity and an unregistered franchise in South Dakota, so that no valid contract was formed or could be formed. Defendants simply cannot use an illegal act to form a valid contract. *See Nature's 10 Jewlers v. Gunderson*, 2002 SD 80, ¶ 13 (stating [t]his Court will not permit the individuals who committed the illegal acts on behalf of the corporation to benefit from the arbitration clause in an illegal contract[,]" and that "[w]hile there may be a policy favoring arbitration when a contract provides for it, you cannot arbitrate a felony[4].") Consequently, it is the Court, not an arbitrator, which has the authority to resolve issues of whether an arbitration agreement was formed, whether it is enforceable, and whether, if formed, it applies to the particular issues in dispute. *Granite Rock Co.*, 130 S. Ct. at 2857-58 (citing *First Options*, 514 U.S. 938, 943 (1995)).

Moreover, arbitration is consensual. *Granite Rock Co.*, 130 S. Ct. at 2857. The test for arbitrability remains whether the parties consented to arbitrate the dispute in question. *Id.* at 2861 n. 11. Because no contract was formed, neither was an arbitration agreement. Thus, Plaintiff did not consent to arbitration, and especially did not consent to arbitrate nonarbitral issues. Courts will only require arbitration of disputes which the parties have agreed to arbitrate. *Id.* at 2857.

---

[4]See SDCL 37-25A-47 (stating any person who, in conjunction with the sale of a business opportunity, violates the notice filing provision, or knowingly makes false or misleading statements is guilty of a Class 5 felony); SDCL37-5B-4 (stating that fraud in conjunction with the sale of a franchise constitutes a Class 4 felonly); SDCL 37-5B-25 (stating that making untrue statements of material facts or omitting to state a material fact in conjunction with the sale of a franchise constitutes a Class 6 felony).

Should the Court find, despite Defendants' willful violations of South Dakota business opportunity and franchise laws, that a valid contract was formed and further, that a valid arbitration agreement was formed, then Plaintiff respectfully submits that the foregoing claims are not within the scope of the arbitration provision. The arbitration provision at issue here states, in pertinent part, that "[a]ny dispute <u>relating to the interpretation or performance of this Agreement</u> shall be resolved at the request of either party through binding arbitration." Ex. 5 to the Amended Complaint (Executed Agreement) p. 8 (emphasis added). Plaintiff respectfully submits that none of the issues here are within the scope of the arbitration provision, namely:

1. Were Defendants authorized by the State of South Dakota to offer or sell a business opportunity or franchise in South Dakota;

2. Was a valid offer was made;

3. Was a valid offer was accepted;

4. Was a valid contract formed;

5. Was a valid arbitration agreement formed;

6. If formed, are these issues within the scope of the arbitration agreement;

7. Did Defendants willfully violate South Dakota business opportunity and franchise laws;

8. Are Defendants are liable to Plaintiff for fraud, deceit, misrepresentation and unjust enrichment.

In South Dakota, the sale of a franchise or business opportunity is treated as a sale of a security. South Dakota statutes, in particular SDCL Chapters 37-5B and 37-25A, prohibit the offer or sale of a franchise or business within South Dakota until a franchise or business opportunity offering circular has been filed on the public record with, and registered by, the South Dakota Division of Securities. Plaintiff respectfully submits that

because Defendants did not register their business opportunity and franchise offering as required, no valid offer was made for Plaintiff to accept. In addition, because of Defendants' fraud, deceit and misrepresentations, Plaintiff cannot not be said to have accepted the offer, even if Defendants had the authority to make it. Moreover, because of Defendants' fraud, deceit and misrepresentations in their fraudulent offer and fraudulent enticement, the entire interaction between the parties was built upon a fraudulent foundation, so"no meeting of the minds" occured from which a contract could form.

Plaintiff respectfully submits that based upon the facts and argument herein, no valid offer was made for him to accept, no valid contract formed, no valid arbitration agreement formed, so that Plaintiff did not consent to arbitrate these issues; nor does the arbitration provision encompass these issues. Consequently, Plaintiff seeks injunctive relief.

B.       *Dataphase Factors Favor Injunctive Relief*

The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir.1993). The decision to grant preliminary injunctive relief is solely within the trial court's discretion, and in which it weighs (1) the threat that Plaintiff will suffer irreparable harm absent injunctive relief; (2) the state of the balance between the irreparable harm to Plaintiff and the injury inflicted on Defendants if the preliminary injunction is granted; (3) Plaintiff's probable success on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). When weighing these factors, no single factor is itself dispositive; in each case all factors must be considered to determine on balance whether they weigh towards granting the injunction. *Id.* at 113-14. Based upon the following

14

analysis, Plaintiff respectfully submits that consideration of the *Dataphase* factors supports his request for injunctive relief.


1.    *Plaintiff Faces Irreparable Harm*

Harm is irreparable if money damages alone are an inadequate remedy. *Keating v. Univ. of S.D.*, 386 F. Supp.2d 1096, 1105-06 (D.S.D. 2005) (citing *Gelco Corp. v. Conistson Partners*, 811 F2d 414, 418 (8th Cir. 1987)).  A party suffers irreparable harm when it is forced to arbitrate a dispute it did not agree to arbitrate. *McLaughlin Gormley King Co. v. Terminix Intern. Co., L.P.,* 105 F.3d 1192, 1194 (8th Cir. 1997) (identifying the cost of defending the arbitration and legal action to challenge unfavorable arbitration awards as a source of irreparable harm).  Consequently, to the extent that Defendants seek to arbitrate claims resulting from a contract which never formed and an arbitration agreement which never formed, Plaintiff would suffer irreparable harm.

In addition, Plaintiff will also suffer immediate irreparable harm if arbitration is not enjoined because he will be forced to either participate in a proceeding to which he did not consent, or abstain and risk a default judgment against him.  Denial of injunctive relief would result in a multiplicity of proceedings, including those in this court, arbitration in Georgia and presumably subsequent legal proceedings in District Court in Georgia. Should Defendants prevail at the arbitration, Plaintiff would then be required to invest more time and resources seeking judicial relief from a decision that allegedly never should have been made in the first place.

Moreover, the issues of formation of a contract resulting from willful violations of South Dakota business opportunity and franchise laws are not arbitrable, nor are Plaintiff's claims for fraud, deceit, misrepresentation and unjust enrichment.  Finally,

arbitration, especially the expedited arbitration Defendants demanded, significantly limits

discovery which will stymy Plaintiff's ability to adequately prosecute his claims, such as

discovering further evidence of Defendants' willful and reckless conduct, deceit and

fraud. Thus, this factor favors granting injunctive relief.

2. *The Balance of Interests Between the Parties Favors Issuance of Injunctive Relief*

Entry of the temporary restraining order will not cause Defendants to suffer any

harm or prejudice except perhaps a delay in arbitration. Whereas, unless the temporary

restraining order is granted, Plaintiff will either have to adjudicate his claims in two

forums and proceed to arbitrate an illegal agreement, or risk having an arbitration award

entered against him. Consequently, the harm of not granting the preliminary injunction is

greater to the Plaintiff than is the harm to the Defendants in granting the preliminary

injunction. The only harm to Defendants, if the Court should enjoin arbitration while it

determines the arbitrability question, is that arbitration will be briefly delayed. If, despite

Plaintiff's contention to the contrary, the Court finds that the issues of contract formation,

arbitration agreement formation, Defendants' authority to offer or sell an unregistered

security in South Dakota, the offer's validity, contract formation and arbitration

agreement formation, can be arbitrated, then arbitration can proceed.

Defendants may argue that if the Court denies Plaintiff injunctive relief, they will

avoid the cost of defense in South Dakota. They would be mistaken, however, because

even if the Court determines that some of Plaintiff's claims are arbitrable (which Plaintiff

submits they are not), Defendants will still be in South Dakota defending against

Plaintiff's claims for fraud, deceit, misrepresentation, unjust enrichment, and willful

violation of South Dakota business opportunity and franchise laws. Because, absent a

Court's summary judgment to the contrary, they are matters for a jury to decide.
Consequently, this factor also weighs in favor of the relief requested.

         3.     *Plaintiff's Probable Success on the Merits*

To determine whether to grant a preliminary injunction, the Court's initial estimation of the strength of Plaintiff's case plays a role, but is not determinative. *Dataphase Sys. Inc.*, 640 F.2d at 113. The probability of success does not require that the party seeking relief prove a greater than fifty percent likelihood that it will succeed on the merits. *Id.* Instead of a rigid measuring stick, the Court flexibly weighs the particular circumstances of the case to determine "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

         (A)     *Plaintiff's Probable Success on his Willful Violation of South Dakota Franchise Law Claim*

Plaintiff respectfully submits that he has a probable success on the merits of his claims that Defendants willfully violated South Dakota franchise and business opportunity laws and that Defendants' offered and sold unregistered securities. Because of Defendants' failure to comply with state law, no contract was formed.

The Value Forward Network Curriculum License Agreement implicates SDCL 37-5B, because it meets the definition of "franchise" as defined by SDCL § 37-5B-1(11):

> "Franchise," any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:
>
> (a)     The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(b)     The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

(c)     As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate;

SDCL 37-5B-1(11)(a-c).

The Value Forward Network Curriculum License meets the criteria in SDCL 37-5B-1(11)(a) in that it offered Mr. Kubista the right to operate a business identified or associated with Value Forward Network's trademark, and to offer, sell or distribute services which are identified or associated with Value Forward Network's trademark. *See* Ex. 5 to Amended Compl. at 2, section 1 (Value Forward Network Curriculum License Agreement); *see also id.* at 3, section 2 (establishing the trademark association with the services for which Mr. Kubista obtained the right to sell under the Agreement); *id.* at 4-5 section 3 (describing the Licensee's obligation with regard to the sale of Services for which Mr. Kubista obtained the right to sell under the Agreement).

The Value Forward Network Curriculum License also meets the criteria of SDCL 37-5B-1(11)(b) in that under and throughout the Agreement, Defendants retain authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation.  In particular, but not limited to, the Agreement controls the facilitators' or licensees' requisite initial training, requisite additional training, limits the services provided, prohibits public speaking about the Curriculum, prohibits Licensees' hire of contractors and subcontractors, and requires that Licensees provide services to clients only in person, expressly prohibiting services provided via media.  Ex. 5 to Amended Compl. at 2-3, section 1 (Value Forward Network Curriculum License Agreement).  Defendants retain

further control over its licensees in Section 2.4 (requiring licensees to provide Defendants a copy of all advertising, promotional or marketing material for the services bearing any licensed Trademark), in Section 3.1(c) (requiring keeping Defendants updated of the changes in the licensees' employees' status), Section 3.2 (prohibiting modification or translation of the curriculum without prior written consent, prohibiting distribution of the curriculum, prohibiting merger of the curriculum with other materials, products or services without prior written consent). *Id.* at 1-5.

The Value Forward Network Curriculum License meets SDCL 37-5B-1(11)(c) by requiring a fee, here $15,000 per year for three years for a total of $45,000. *Id.* at 1, 5 (section 4).

Plaintiff respectfully submits that based upon the foregoing, the Agreement at issue herein meets all three criteria of the statutory definition of "franchise," and thus implicates chapter SDCL 37-5B. Consequently, before Defendants attempted to offer to sell their Agreement, a franchise under South Dakota law, they were required to register the Agreement with the South Dakota Division of Securities and make the requisite disclosures.

Defendants attempt to circumvent South Dakota's registration provision, both in the Agreement (stating that "[t]he parties acknowledge and agree that Licensee relationship created by this Agreement is not intended to be and shall not be construed to be a franchise or business opportunity."), and in their marketing (stating that a license differs from a franchise because "[a] license charges an annul rate and no royalties. A franchise charges you an initial franchise fee and additional royalty fees which are usually 8-10% of your annual revenues per year."). Ex. 5 to the Amended Compl. at 5, section 5.2 (Executed Agreement). Defendants cannot, however, avoid the registration

provisions by agreement, because the authority to offer or sell a franchise in South Dakota comes from the state of South Dakota, not Mr. Kubista. And, because Defendants failed to first obtain the authority from South Dakota to make a valid offer, no contract formed between the parties. *See* SDCL 37-5B-3 (stating that "[n]o franchise is sold in South Dakota by or on behalf of the franchisor until the offering has been filed by notice and the franchise disclosure document has been delivered to the purchaser prior to the sale and in compliance with this chapter."); *see also* SDCL 37-5B-4 ("It is unlawful for any person to offer or sell a franchise in this state unless the franchise has properly notice filed under this chapter . . . .").

The significant assistance criteria is also met. For instance, Defendant Paul DiModica also provided significant assistance by providing a "fast start" marketing plan, marketing tools, free "teleseminars" for prospects, and Defendant Paul DiModica said he would personally help close a sale. Ex. 21 (Kubista Decl.) ¶ 10.

In analogy, if a Nebraska lawyer, not admitted to practice in South Dakota, retained a South Dakota client and represented that client in South Dakota, regardless of the agreement between the client and lawyer, the Nebraska lawyer is not authorized to practice law or collect a fee in South Dakota. There can be no lawful offer to provide legal services from the Nebraska lawyer for the South Dakota client to accept.

While Defendants' "say" their Agreement is not a franchise, it is what Defendants "do" which is more telling. For example, Defendants apparently believe their Agreement constitutes a franchise as evidenced by their advertisement on multiple franchise websites, including but not limited to the following:

a. www.businessopportunityamerica.com (stating with regard to Value Forward: "Business or Franchise: Franchise" and available in all states.) *See* Ex. 6.

b.     www.franchisegator.com (stating "Home Franchise Directory Value Forward Management Coaching, and indicating "Value Forward Management Coaching is currently accepting inquiries from the following states: . . . South Dakota.") *See* Ex. 7.

c.     www.thefranchisecoach.net (stating "If you are looking for information on the Value Forward Management Consulting franchise business opportunity, Value Forward Consulting franchises or Value Forward franchising, then you have come to the right place." *See* Ex. 8.

d.     www.homebasedfranchises.com/Value_Forward_Network.cfm *See* Ex. 9.

e.     www.franchiseopportunities.com *See* Ex. 10.

f.     www.franchise.com *See* Ex. 11.

g.     www.franchisegenius.com (stating "Be Your Own Boss - Find Your Perfect Franchise Opportunity Today!") *See* Ex. 12.

h.     www.franchisebuyersnetwork.com/franchise/value-forward-management-coaching *See* Ex. 13.

i.     www.franchiseadvantage.com/Franchises/2245-Value Forward Management_Coaching_Franchise.aspx *See* Ex. 14.

j.     www.franchisebuy.com/franchise/Value-Forward-Network *See* Ex. 15.

k.     www.thefranchisecoach.net/valueforwardmanagmentconsulting.htm *See* Ex. 16.

l.     www.franchiseclique.com/franchise/Value-Forward-Consulting *See* Ex. 17.

m.    www.franchisedirect.com/trainingfranchises/44 (stating "Value Forward Business Consulting Become a trusted business advisor that executives and management teams rely on; 6 profit centers with this...." *See* Ex. 18.

n.     www.franchisedirect.com/directory/valueforwardbusinesscoaching/2572/ *See* Ex. 19

(B)     *Plaintiff's Probable Success on the Willful Violation of his South Dakota Business Opportunity Law Claim*

Plaintiff respectfully submits that he also has a probable success on the merits

because no contract was formed due to Defendants' willful violations of South Dakota

business opportunity law.  Defendants knew they were offering a business opportunity as evidenced by their attempt (described above) in the Agreement to have licensees agree that the Agreement neither constitutes a franchise or business opportunity.  Under both the franchise and the business opportunity statutes, Defendants' compliance cannot be waived.  SDCL 37-5B-21 (stating in pertinent part that "any condition, stipulation, or provision requiring a franchisee to waive compliance with or relieving a person of a duty or liability imposed by or a right provided by this chapter or a rule or order under this chapter is void."); SDCL 37-25A-54 (stating [a]ny stipulation or provision binding any purchaser of a business opportunity to waive compliance with or relieving a person from any duty or liability imposed by or any right provided by this chapter or any rule or order issued pursuant to this chapter is void."). In addition, just like Defendants' advertisements on numerous franchise websites, they similarly market their offering on business opportunity sites.  *See, e.g.,* Ex. 20 to the Amended Compl. ([www.business-opportunities.biz/20008/06/03/value-forward-business coaching/](www.business-opportunities.biz/20008/06/03/value-forward-business coaching/)).

The Value Forward Network Curriculum License Agreement implicates SDCL 37-25A, because it meets the definition of "business opportunity" as defined by SDCL 37-25A-1(2), defining "business opportunity" as follows:

> (2) "Business opportunity," a contract or agreement, between a seller and purchaser, express or implied, orally or in writing, wherein it is agreed that the seller shall provide to the purchaser any products, equipment, supplies, or services enabling the purchaser to start a business and the seller represents that:***

> (b) The seller shall provide or assist the purchaser in finding outlets or accounts for the purchaser's products or services;***or

> (f) The seller shall provide a marketing plan.

> To meet the definition of a business opportunity, the Value Forward Network

Curriculum License Agreement need only meet the criteria of one of the foregoing sub-paragraphs. Plaintiff respectfully submits that the Agreement readily meets subparagraphs (b) and (f).

For instance, this offering meets the criteria of SDCL 37-25A-1(2)(b), because Defendant Paul DiModica represented that he would provide or assist Mr. Kubista in finding accounts for his services, and that he would provide significant assistance to find purchasers. The Agreement itself also meets the criteria set forth in subparagraph (f because Defendant Value Forward Network provided direct sales letters, guidance on marketing, a "fast start" marketing plan, and teleseminars for prospects. Defendant Paul DiModica also said that he would make himself available to help licensees close sales by getting on a conference call with the prospect. Ex. 21 (Kubista Decl.) at ¶ 10.

As demonstrated above, although the Agreement offered need only meet one of the subparagraphs of SDCL 37-25A- 1, it readily meets two, both subparagraphs (b) and (f). Consequently, the Agreement constitutes a business opportunity under South Dakota law, so that prior to offering the Agreement to Mr. Kubista, Defendants were required to register the business opportunity offering with the South Dakota Division of Securities and provide the requisite disclosures. Since they failed to do so, Defendants had no authority to make the offer. *See* SDCL 37-25A-7 (stating that "[n]o person may offer or sell any business opportunity in this state unless the business opportunity is registered under this chapter . . . ."). Since there was no valid offer made, none could be accepted. Consequently, as a matter of law, no contract was formed, nor was an arbitration agreement.

(C)    *Plaintiff's Probable Success on the Fraud, Deceit, Misrepresentation and Fraudulent Concealment and Unjust Enrichment Claims*

Plaintiff respectfully submits that it is probable he will succeed on his fraud, deceit, misrepresentation, fraudulent concealment and unjust enrichment claims. As set forth in the Amended Complaint, Defendant Paul DiModica violated SDCL 37-25A-43, SDCL 37-5B-24, and SDCL 37-5B-25 by making, in conjunction with the Value Forward Network business opportunity and franchise offer, misleading, deceptive and fraudulent statements and omissions in advertising, untrue statements of material fact and omitted material facts necessary, and by making and engaging in acts, practices and in a course of business which operated as a fraud and deceit. While these matters are generally for a factfinder to resolve and are based on the credibility of witnesses, a strong inference of fraud, deceit, misrepresentation and fraudulent concealment can be made when Defendants failed to register their offering under the business opportunity and franchise laws, they attempt to contract around compliance, and they delete paragraph 3(f) which was in the "generic" agreement originally forwarded to Mr. Kubista which mentions adherence to all local and federal licensing requirements "including but not limited to . . . securities[.]" *See* Ex. 3 to the Amended Complaint. (Generic Licensing Agreement).

Consequently, this factor favors injunctive relief.

### 4. *Public Interest Considerations Favor Injunctive Relief*

Public interest considerations favor the issuance of injunctive relief. The public has in interest an protecting prospective franchisees and prospective purchasers of business opportunities by providing them with the information necessary to make an intelligent decision regarding franchises and business opportunities offered. The public also has an interest in prohibiting the sale of franchises and business opportunities where such sale would lead to fraud or a likelihood that the franchisors' or sellers' promises

would not be fulfilled, and to further protect the prospective franchisees and prospective purchasers by providing a better understanding of the business relationship between the franchisor and the franchisee and the business opportunity seller and purchaser. Consequently, this factor favors injunctive relief.

## III.    PERMANENT INJUNCTION STANDARD MET

"The standard for issuing a preliminary or permanent injunction is essentially the same, excepting one key difference." *Smith v. South Dakota*, 781 F. Supp. 2d 879, 882 (D.S.D. 2011) (quoting *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008)). "A permanent injunction requires the moving party to show actual success on the merits, rather than the fair chance of prevailing on the merits required for a standard preliminary injunction." *See id.* If a court finds actual success on the merits, it then considers the following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest. *See Planned Parenthood,* 530 F.3d at 729 n.3; *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

Plaintiff respectfully submits that the *Dataphase* analysis recited above, along with the evidence submitted herewith, demonstrates his actual success on the merits. Defendants' offering implicates both the franchise and the business opportunity statues and meets the criteria to be categorized as both. In violation of the franchise and business opportunity statutes, Defendants engaged in fraud by offering Plaintiff unregistered securities. *Natures' 10 Jewelers v. Gunderson*, 2002 SD 80 (holding that there was no valid contract resulting from the sale of a franchise for which the registration had expired). As a result of their willful failure to register, no valid offer was

or could be made, so that no contract was formed, nor was an arbitration agreement formed. Even if they were, however, these issues are nonarbitral because they do not fall within the scope of the arbitration provision at issue.

## IV.    CONCLUSION

Based on the foregoing, Plaintiff respectfully submits that he has not only shown a probability that he will succeed on the merits at trial, but also that he has shown actual success. In addition, Plaintiff has shown that he would suffer irreparable harm if forced to arbitrate nonarbitral claims in Georgia, that the harm Plaintiff would experience if he were forced to arbitrate nonarbitral claims to which he did not consent is more severe than any harm Defendants would suffer if the arbitration were delayed, and that the public interest is best served by issuing a temporary restraining order, preliminary and permanent injunction to enjoin Defendants from proceeding with arbitration in Georgia during the pendency of litigation.

Accordingly, Plaintiff respectfully seeks this Court's Order issuing a Temporary Restraining Order, and Preliminary and Permanent Injunction.

Plaintiff respectfully requests an expedited hearing.

Dated this 20th day of April, 2012.

*/s/ Judith K. Zeigler*
_____
JUDITH K. ZEIGLER
PO BOX 1448
SIOUX FALLS, SOUTH DAKOTA 57101-1448
TEL:    (605) 274-0086
FAX:    (888) 809-9084
judy@jkzlaw.com

CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of April, 2012, a true and correct copy of the Memorandum in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction was served upon the following person, by placing the same in the service indicated, as follows:

Mr. Michael Schaffer
Schaffer Law Office, Prof. LLC
412 West 9th Street - Suite 1
Sioux Falls SD 57104
mikes@schafferlawoffice.com

    [   ]    U.S. Mail     [   ]    Hand Delivery
    [   ]    Facsimile    [ x ]   Electronic Case Filing

*/s/ Judith K. Zeigler*

_____
Judith K. Zeigler